## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BANK SOYUZ**, a Russian Joint Stock )
Commercial Bank, Dolgorukovskaya St., )
34, Moscow, 1270006, Russian )
Federation )
)
**OFFICE OF FOREIGN ASSETS** )
**CONTROL**, Robert W. Werner as )
Director, **UNITED STATES** )
**DEPARTMENT OF THE** )
**TREASURY**, 1500 Pennsylvania )
Avenue, N.C., Washington, D.C. 20220 )
)
Defendant. )

CASE NUMBER  1:05CV01073

JUDGE: Royce C. Lamberth

DECK TYPE: Administrative Agency Review

DATE STAMP: 05/27/2005

### COMPLAINT

COMES NOW Plaintiff, the Russian commercial stock bank "SOYUZ," pursuant to the

Administrative Procedure Act, 15 U.S.C. § 706(2)(a), and demands judgment on the ground that

Plaintiff is the object of arbitrary and capricious agency action by the Office of Foreign Assets

Control, United States Department of the Treasury.

### Introduction

(1)    This action seeks judicial review of an action by the United States Department of

the Treasury, Office of Foreign Assets Control ("OFAC"), taken pursuant to the Sudanese

Sanction Regulations, 31 C.F.R. Part 538, issued pursuant to the International Emergency

Economic Powers Act,  50 U.S.C. § 1701 *et seq.* ("IEEPA").  As the result of OFAC's actions,

an account belonging to Plaintiff at the Israel Discount Bank of New York in the amount of

approximately $411,397 has been frozen under the Sudanese Sanctions Regulations for the past

five years, even though no Sudanese entity, or any entity other than Plaintiff, has any interest in

the account.

(2)      On or around March 13, 2000 Plaintiff's corporate parent, a prominent Russian insurance provider named Ingosstrakh Ltd. (successor to the Soviet state-owned insurance carrier), paid the sum of 250,000 British pounds sterling as compensation for a shipment of wheat flour that was damaged upon its arrival at the port of destination in Khartoum, Sudan. Neither Plaintiff nor Ingosstrakh have, or ever had, any relationship with the Sudanese purchaser. Ingosstrakh's contract covered the contents of a non-U.S. vessel, the M.V. "Gerta," a Cambodian ship, and was issued by Ingosstrakh in the ordinary course of business to non-U.S. commercial entities located in Germany.  Neither Plaintiff nor Ingosstrakh had any knowledge about, or control over, the destination of the wheat flour, nor did (or does) Plaintiff have any commercial or other relationship with the Sudanese purchaser of the wheat flour.  Ingosstrakh's insurance commitment extended to the contents of the cargo vessel, which was not Sudanese, and its owners, who were not Sudanese.  By inadvertence, Plaintiff routed the 250,000 GBP payment through a United States correspondent bank, the Israel Discount Bank of New York, and the payment was frozen by that bank pursuant to the Sudanese Sanction Regulations.

(3)      Plaintiff's parent Inkosstrakh Ltd. is a reputable insurance company that earned its goodwill by meeting its obligations as any insurance company would seek to do.  Ingosstrakh is the successor to the Soviet state insurance company and has over 50 years of worldwide experience.  It is known throughout the world for its reliability as an insurance carrier. Ingosstrakh meets and pays its claims.  Its economic success – indeed its survival - depends on the goodwill of the international public which it serves.

(4)      Although Plaintiff's payment of insurance proceeds for the damaged wheat flour was frozen in the Israel Discount Bank of New York, Ingosstrakh's contractual obligation to compensate the Sudanese purchaser for the damaged wheat flour was not extinguished.

Ingosstrakh was therefore *required* by its insurance contract – a contract between non-U.S. entities, entered outside the jurisdiction of the United States, which did not involve the United States or Sudan in any way - to make a second payment, which was not routed through a United States bank, in order to compensate the Sudanese purchaser for the damaged wheat flour. Plaintiff then, in conformance with policy and procedure for which OFAC had an established precedent, made application to OFAC for a license removing the block on its account at the Israel Discount Bank of New York. For reasons not understood by Plaintiff, but lacking a rational basis, and in contradiction of its own precedent, OFAC denied Plaintiff's application.

(5)     OFAC routinely grants licenses to release the block on frozen bank accounts when an account is frozen, such as in the present case, for no reason other than an inadvertent routing of payment. However, in this case, OFAC refused Plaintiff's license application on the grounds that the account constituted "property" of Sudan, even though the payment of GBP 250,000, as contractually mandated compensation for the damaged wheat flour, had already been effected by Ingosstrakh, and even though the only remaining property interest in the account belongs to the Plaintiff.

(6)     The IEEPA authorizes the President to act, in the event of a national emergency "which has its source in whole or in substantial part outside the United States," 50 U.S.C. § 1701(a), to regulate or prohibit transfers of funds or property and trade with a country. 50 U.S.C. § 1702(a)(1). In furtherance of this aim, OFAC has broad authority to choose and apply its own definition of property interests. Under section 1704 of the Emergency Powers Act, 50 U.S.C. § 1704, the President may "issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter." Among those authorities is the power to "prohibit any …transfer []f] any property in which any foreign

country or a national thereof has any interest. *Id.* § 1702(a)(1)(B). The President delegated his power to define the statutory terms to the Secretary of the Treasury, *see* Exec. Order No. 12724, 55 Fed. Reg. 33089 (1990), and OFAC exercises the delegated power on the Secretary's behalf. By these provisions OFAC has received the authority to administer the statute, and its interpretations of its regulations must be upheld by the Court unless they contradict the express statutory language or prove unreasonable in a particular case. However, OFAC's refusal to un-block Plaintiff's account at the Israel Discount Bank of New York is exactly such a case.

(7)    Despite the broad discretion of OFAC to construe and administer its own regulations, the agency has committed an irrational act in this case and reached a result that does nothing to further the interest of the Sudanese Sanction Regulations. The action taken by OFAC results in an impediment to the international trade of the United States and is irrational, arbitrary and capricious. OFAC's decision merely freezes the property of the Plaintiff, a foreign corporation who was not a party to the underlying transaction between the vessel operators and the Sudanese purchaser, but who was required to make an insurance payment when a cargo of wheat flour arrived in a damaged state.

(8)    This case involves an area in which OFAC's jurisdiction is particularly broad, as it involves an economic embargo, and the Court must avoid second-guessing the judgment of an agency entrusted with enforcement of the foreign policy of the United States and the contemporaneous construction of its own regulations. However, the discretion of the agency is not without limit. The decision must be rational, and preferably not in dereliction of the commercial interests of the United States, which lie in an international marketplace where foreign entities – including such friends of the United States as Plaintiff – have an expectation that they will not be subject to the arbitrary and capricious seizure of a bank account for no

reason other than an inadvertence in the international routing of an insurance payment on a cargo of damaged wheat flour.

## Jurisdiction

(9)      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a)(3), 1337, 1346(a)(2), 1361 and 2461(a).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1391(e).

## Parties

(10)      Plaintiff, Bank Soyuz, is a joint stock commercial bank organized and existing under the laws of the Russian Federation, with headquarters at Dolgoruykovskaya str., dom 34, str. 1, 127006, Moscow.  Founded in 1993, Plaintiff was known as Ingosstrakh-Soyuz Bank until March 2004.  As noted above, it is a subsidiary of Ingosstrakh Ltd., successor to the Soviet state-owned insurance carrier.  It is one of the top 40 commercial banks in the Russian Federation.

(11)      Defendant, OFAC, is the office within the U.S. Department of the Treasury that is responsible for administering and enforcing United States economic sanctions.

## Background

(12)      On November 3, 1997, President Clinton issued Executive Order 13067, blocking Sudanese government property and prohibiting transactions with Sudan.  62 Fed. Reg. 59989 (Nov. 5, 1997), prohibits, among other things:

> [t]he exportation or reexportation, directly or indirectly, to Sudan of any goods, technology (including technical data, software, or other information), or services from the United States or by a United States person, wherever located, or requiring the issuance of a license by a Federal agency, except for donations of articles intended to relieve human suffering, such as food, clothing, and medicine.

Executive Order 13067, Section 2(b), 62 Fed. Reg. 59989 (Nov. 5, 1997).

(13)    Every year since Executive Order 13067, the embargo on Sudan has been

extended. Most recently, on November 1, 2004, the President issued the following notice:

> On November 3, 1997, by Executive Order 13067, the President declared a
> national emergency with respect to Sudan pursuant to the International Emergency
> Economic Powers Act (50 U.S.C. 1701-1706) to deal with the unusual and extraordinary
> threat to the national security and foreign policy of the United States constituted by the
> actions and policies of the Government of Sudan. Because the actions and policies of the
> Government of Sudan continue to pose an unusual and extraordinary threat to the
> national security and foreign policy of the United States, the national emergency
> declared on November 3, 1997, and the measures adopted on that date to deal with that
> emergency must continue in effect beyond November 3, 2004. Therefore, consistent with
> section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for
> 1 year the national emergency with respect to Sudan.

Notice of November 1, 2004, Continuation of National Emergency With Respect to Sudan, 69

Fed. Reg. 63915 (Nov. 2, 2004).

(14)    The Sudanese Sanction Regulations, 31 C.F.R. Part 538, provide in relevant part:

> Except for information or informational materials and donated articles intended to
> relieve human suffering, such as food, clothing and medicine, and the licensed export of
> agricultural commodities, medicine, and medical devices, no goods, technology or
> services may be exported from the United States to Sudan, either directly or through
> third countries, without a license.

See http://www.treas.gov/offices/enforcement/ofac/sanctions/sudan.txt (emphasis added).

(15)    OFAC's regulations provide for the possibility of obtaining a license for export to

Sudan on a case-by-case basis. Such authorization has been primarily limited to agricultural

commodities and products (such as the wheat flour involved in the present case) as well as

medicine and medical equipment. If Ingosstrakh, in its role as the insurance underwriter for a

shipment of wheat flour in a Cambodian vessel, had any way of knowing that the vessel was

bound for Sudan, it could theoretically have filed a valid application for a license on the grounds

that the content of the cargo was an agricultural commodity. However, to construe OFAC's

jurisdiction to require such a license would bring the international insurance market to a

standstill by introducing an unrealistic requirement on non-U.S. underwriters of insurance for non-U.S. cargo vessels operated by non-U.S. entities to monitor the destination of such vessels on a real-time basis.

(16)    Although the majority of license applications for authorization of commercial exports to Sudan are denied, the majority of issued licenses permit the unblocking of financial transactions for individual remitters who inadvertently routed their funds through blocked Sudanese banks. *See* OFAC regulations issued December 17, 2004, 69 Fed.Reg. 75468 (Dec. 17, 2004). In accordance with its own published practice and procedure, *id.,* it would have been rational and consistent for OFAC to grant the license that Plaintiff applied for, as the seizure of Plaintiff's account resulted only from an inadvertence in routing.

### Events Leading to This Controversy

(17)    On April 1, 1999, Plaintiff's parent, Ingosstrakh, issued an insurance policy, entitled "Certificate of Insurance No. 173/17/99," covering the contents of the general cargo vessel, M.V. "Gerta," a ship registered in Cambodia. The insurance policy was issued to:

(a)    N.K. Shipping Ltd., Valetta, Malta, as owners;

(b)    Transmarine Supping & Trading GmbH, Hamburg, Germany, as managers; and

(c)    Rotos Shipping & Transport Agency GmbH, Hamburg, Germany, as operators.

(18)    The insurance policy issued by Ingosstrakh did not cover a particular shipment or a particular destination. It covered a particular period of time, namely, one year. Neither Plaintiff nor Ingosstrakh had any manner of discerning and, generally speaking, as a provider of such insurance, Ingosstrakh has no manner of discerning, the contents or destination of a particular shipment subject to such an insurance policy.

(19)    Upon the arrival of the M.V. "Gerta" in the port of Sudan on June 22, 1999, it was discovered that some of the wheat flour constituting the cargo of the ship had suffered damages and a portion of it had been rejected by the consignee, a Sudanese entity named Sotisco Trading Co. Ltd.  This led to negotiations regarding the value of the damaged flour, following which a settlement was reached establishing a valuation of the damage at 250,000 British pounds sterling.

(20)    On March 5, 2000, Sotisco Trading Co. Ltd. issued an invoice to Rotos Shipping & Transport Agency GmbH, Hamburg, Germany, for contaminated and damaged wheat flour, stating, "We debit you with [the] agreed amount of amicable settlement for above damages." The invoice concluded, "Please immediately effect remittance to the following address: United European Bank Geneva, to order of Islamic Development and Co-operative Bank, Account No. 253098/34 N., to the ultimate credit of Sotisco Trading Co., P.O. Box 45091, Khartoum, Sudan.

(21)    On March 6, 2000, Adjustment & Claims Expert Services GmbH, (ACES), of Hamburg, Germany, in the ordinary course of business, sent a facsimile to Plaintiff, regarding the damaged wheat flour received in the Port of Sudan on June 22, 1999.  The facsimile noted that because of the alleged damage to the wheat flour due to alleged cargo residues, the Sudanese health authority had refused to permit the discharge of the remaining 1.8 thousand metric tons of cargo in the vessels holds and valuated the loss at approximately $610,000.  However, the amount was subsequently negotiated to 250,000 British pounds sterling, and the facsimile from ACES stated:

> Coming back to the captioned matter, please find enclosed as requested the Debit Note No. NG003116 dated 05.03.2000 from Sotisco Trading in the total amount of GBP 250,000.00 in full and final settlement of this claim.

> Please take note that this Debit Note is valid for full settlement within one week as from date of issue (05.03.2000) and we would suggest not to loss [sic] this settlement and arrange for payment as soon as possible.

Payment should be effected to:

> United European Ban Geneva
> To order of Islamic Development and Co-operative Bank
> Account No. 23 30 96 / 34 N

To ultimate credit of:

> Sotisco Trading Co., P.O. Box 45 09 1, Khartoum, Sudan.

However we would very much appreciate to receiving [sic] a copy of remittance order enabling us to speed up proceedings and receipt of the release form from plaintiffs and an official dismissal form from the court of course.

After settlement negotiations with the claimant, Messrs. Sotisco, Ingosstrakh as the P&I insurer managed to agree upon a full and final settlement of the claim in the amount of GBP 250,000 subject to prompt payment to Sotisco's account with the Islamic Development and Cooperative Bank of Khartoum, Sudan.

(22)    On March 9, 2000, Rotos Shipping & Transport Agency GmbH of Hamburg, Germany, in the ordinary course of business, sent a facsimile to Plaintiff in Moscow, stating:

> We kindly request you to pay directly the invoice NR NG003115 DD 05.3.2000 in amount GBP 250,000 (English pounds two hundred fifty thousand) in full and final settlement of the claim of receivers Sotisco Trading Co., Khartoum, Sudan, against MV Gerta at Port of Sudan.

(23)    On or around March 14, 2000, in the ordinary course of business, Plaintiff wired the 250,000 British pounds sterling as required by its standard insurance contract, designating the United European Bank, of Geneva, as an intermediary financial institution and Sotosco Trading Co., of Khartoum, Sudan, as the ultimate beneficiary.

(24)    On March 14, 2000, the operating unit of the Israel Discount Bank of New York, New York, cancelled the incoming payment from Plaintiff, due to the country of the beneficiary. The funds were placed in a blocked account with the Israel Discount Bank in the amount of USD $378,620.00, in the name of the Plaintiff. With the accrual of interest, the value of that account is approximately $411,397 at this time.

COMPLAINT                                9

(25)   As the funds were not credited to the account of the beneficiary within the agreed period of time, Plaintiff called the payment back.  In response, the Israel Discount Bank of New York wired Plaintiff on March 16, 2000, regarding Plaintiff's "requesting our assistance to lift the OFAC block on the above mentioned transaction."  The bank stated, 'Regrettably we are not in a position to directly involve our bank in this matter.  However we suggest that you contact OFAC in Washington, D.C. directly."

(26)   The record contains a message from Kenneth Walters, Vice President of the International Banking Department at the Israel Discount Bank of New York, stating, "after this matter is resolved with OFAC and the restriction of the U.S. dollar proceeds is lifted any future conversation of the above GBP transfer will be calculated at the then prevailing market rate at your own risk and responsibility."  It was simply assumed by the parties, based on experience with OFAC and the agency's precedent in regard to the administration of its economic sanction regulations, that there was no actual basis to continue the block on this particular account.

(27)   On March 30, 2000, Plaintiff filed with OFAC an application for release of the blocked funds.  The application contained an explanation of the facts alleged above and included copies of:

- Certificate of Insurance No. 173/17/99 dated April 1, 1999;

- Invoice No. NG003116 issued by Sotisco Trading Co. to Rotos Shipping & Transport Agency dated March 5, 2000;

- Facsimile from ACES to Plaintiff dated March 6, 2000;

- Request from Rotos Shipping & Transport Agency to Plaintiff dated March 9, 2000;

- Original payment order from Plaintiff's insurance subsidiary Ingosstrakh Ltd. to Plaintiff for the amount of GBP 250,000, dated March 13, 2000;

- The payment order (SWIFT MT 100) from Plaintiff to the Israel Discount Bank of New York for the amount of GBP 250,000, dated March 14, 2000.

(28)    Plaintiff's March 30, 2000, license application concluded:

We understand U.S. banking institutions are prohibited from participating in transactions in which Sudan has an interest. However, in view of the circumstances we kindly request ... that a specific license [be] issued allowing Israel Discount Bank of New York, New York to remove the funds from the blocked account and to credit our account held in the books of Israel Discount Bank of New York, New York.

(29)    On April 4, 2000, the Department of the Treasury denied Plaintiff's March 30 application, stating:

Under the Regulations, U.S. financial institutions are prohibited from dealing in any property in which the Sudanese Government has an interest. A U.S. financial institution is required to place any such property it receives in an interest-bearing blocked account, even where its role is merely that of an intermediary and the underlying transactions does not otherwise involve a person subject tot U.S. jurisdiction.

As reflected by your application, the funds in question represent a commercial payment to **Islamic Development and Co-operative Bank, Khartoum, Sudan, for the benefit of Sotisco Trading Co., Sudan.** [Boldface in original.] Because the aforementioned bank is owned and/or controlled by the Sudanese Government, the funds represent an interest in property that is properly blocked under the Regulations. Although blocked property is not confiscated, the owner of such property is prohibited from exercising any rights, powers, or privileges over such property, except as authorized by specific license from the Office of Foreign Assets Control.

As it would be contrary to U.S. policy to authorize the release of the funds, your request for a specific license is denied.

(30)    On June 14, 2000, Plaintiff's then counsel, Debevoise & Plimpton, sent a letter to the Office of Foreign Assets Control, requesting reconsideration of the April 4 denial, stating:

There are additional facts, as set forth below, which in our view, favor such action. The funds are being held in a blocked account by virtue of a most embarrassing and inadvertent action on our part – namely, the routing through a U.S. bank of a wire transfer for an insurance loss payment by a Russian insurance company (our parent) in respect of damaged cargo of a non-Sudanese vessel. For your convenience, we set out below the facts generally, and the additional information not available to Mr. Pinter [*i.e.*, the author of OFAC's previous denial].

1.    The vessel "Gerta," on which the cargo damage occurred, is registered under the flag of Cambodia and is owned by N.K. Shipping Ltd., Valetta, Malta, a Maltese company. The insurance contract was between Ingosstrakh and N.K. Shipping Ltd. This insurance contract has been in effect for several years, having been renewed

annually. The insurance contract insures the vessel owner against claims of third parties, namely, the consignees of goods carried on the vessel.

2.      The cargo was wheat flour, which suffered damage during shipment.

3.      Ingsosstrakh Ltd. (our parent company) is by far the largest insurance entity in Russia. It is the successor to the former national insurance company of the USSR. Ingosstrakh has over 50 years of worldwide business experience, uniting 28 companies from Russia, Western Europe, the United States and other countries. The company has a very good reputation and always meets obligations to its customers.

4.      The insurance contract is a term contract covering all shipments made during the terms, and there is no separate insurance for each individual shipment. Ingosstrakh does not know what cargoes are being carried by an insured vessel owner, and does not know the ports of call of the vessels owned by an insured owner. Thus, Ingosstrakh had no way of knowing that the vessel "Gerta" would be carrying goods to Sudan.

5.      After the loss was notified to the owner and a settlement with the consignee had been reached, Ingosstrakh was instructed to make payment to [the] consignee's bank, in Khartoum. The correspondence bank of the consignee's bank was United European Bank, of Geneva, Switzerland. There was no requirement for routing the funds through United States facilities: it just happened, and in our haste we simply failed to investigate the existence of U.S. regulations which would prohibit such a routing of funds.

6.      With the blocking of the funds in the United States, we have been required to pay the insurance loss with additional funds routed through non-U.S. banking facilities. A certification as to the fact of payment to the consignees of the cargo is annexed hereto. All we want now is return of the money in the U.S. to Russia. It will not be sent to Sudan or to Sudanese interests. Thus, the Sudanese Government no longer has an interest in these funds, a fact that was not placed before Mr. Pinter. We have directed the Israel Discount Bank of New York to return the funds to our bank in Russia if permitted by your Office. We will never use the services of U.S. banking facilities in contravention of the Sudanese Sanctions Regulations.

7.      The Russian Federation is not a target of the embargo imposed in accordance with the U.S. Code of Federation Regulations. On the contrary, U.S. policy is to promote business relations between U.S. and Russia, as was underscored by President Clinton's recent visit to Moscow.

8.      The continued blocking of the funds will serve no policy of the United States, and will only serve to impair commercial relations between the United States and Russia.

(31)    On July 21, 2000, OFAC sent a letter to Plaintiff, c/o "Devoice [sic] and Plimpton," in which the agency failed to acknowledge the points in the June 14 letter from Plaintiff's counsel, and merely repeated its former holding, stating:

> This is in response to your letter requesting that we reconsider our original decision concerning the application for a specific license to authorize the release of funds in the amount of USD $378,620. Israel Discount Bank of New York blocked the funds pursuant to U.S. sanctions against Sudan, as implemented by the Sudanese Sanctions Regulations, 31 C.F.C. Part 538.

> Under the Regulations, U.S. financial institutions are prohibited from dealing in any property in which the Sudanese Government has an interest.

(32)    Plaintiff is not a "U.S. financial institution" within the meaning of OFAC's July 21, 2000, communication or any applicable regulation. OFAC's refusal to acknowledge this fact is arbitrary and capricious, an abuse of discretion, and in conflict with OFAC's own policies and procedures.

(33)    OFAC's July 21, 2000 response continued:

> A U.S. financial institution is required to place any such property it receives in an interest-bearing blocked account, even where its role is merely that of an intermediary and the underlying transaction does not otherwise involve a person subject to U.S. jurisdiction.

(34)    Plaintiff does not contest that the Israel Discount Bank of New York acted correctly in blocking the original payment. Instead, Plaintiff seeks review of OFAC's subsequent decision refusing to unblock that account on the grounds that OFAC committed a clear error, and acted arbitrarily and capriciously, in holding that the account was subject to any Sudanese interest.

(35)    OFAC'S July 21, 2000 response concludes:

> Once property is blocked because of a Sudanese Government interest, we do not recognize attempts to cancel the original payment instructions or attempts to make a second payment to the beneficiary as a means of extinguishing the Sudanese Government interest in the original blocked funds transfer.

COMPLAINT                                    13

(36)    Contrary to OFAC's July 21, 2000, communication, Plaintiff never made any "attempt to cancel the original payment instructions," nor, more particularly, did Plaintiff ever take any action aimed at "extinguishing the Sudanese Government interest in the original blocked funds transfer." Plaintiff's exclusive purpose in making its ultimate payment to Sotisco Trading Co. was to fulfill its obligation as an insurance underwriter to pay a loss arising from a shipment of damaged wheat flour pursuant to a non-U.S. contract between non-U.S. parties involving a non-U.S. vessel with no underlying connection to Sudan.

(37)    OFAC's July 21, 2000, communication again recited the canned language of its original communications, revealing that the agency had not considered the supplemental information submitted by Plaintiff. OFAC's July 21 communication concludes:

> As reflected by your application, the funds in question represent a commercial payment to **Islamic Development and Co-operative Bank, Khartoum, Sudan, for the benefit of Sotisco Trading Co., Sudan.** [Boldface in original.] Because the aforementioned bank is owned and/or controlled by the Sudanese Government, the funds represent an interest in property that is properly blocked under the Regulations.

(38)    The communications to Plaintiff from OFAC dated July 21, 2000, indicate that the agency's reflexive determination in this case is attributable to the appearance of the Islamic Development and Co-Operative Bank of Khartoum and Sotisco Trading Co., with no consideration to Plaintiff's absence of control, culpability of any kind, or any relationship with any Sudanese entity in the underlying insurance transaction.

(39)   On October 16, 2000, Plaintiff's Deputy Chairman, on behalf of the Bank, sent a letter to OFAC requesting reconsideration of OFAC's denial of July 21, 2000. Plaintiff's October 16 letter provided yet additional facts to warrant a release of the blocked funds, stating:

Firstly, Ingosstrakh, a Russian company, does not meet any of the criteria established for ... organizations named as Specially Designated Nationals ("SDNs") of Sudan in accordance with Title 31, Part 538 of the U.S. Code of Federation Regulations, namely:

(a)     Ingosstrakh is not owned by the Government of Sudan

(b)     Ingosstrakh is not controlled by the Government of Sudan;

(c)     Ingosstrakh is not acting on behalf of the Government of Sudan.

Therefore, Ingosstrakh may not be subject to any sanctions blocking its property (its monetary funds held in the accounts in the United States) contemplated by Part 538 of the mentioned Code. In accordance therewith Ingosstrakh may not be subject to civil or criminal responsibility.

Joint Stock Commercial Bank 'Ingosstrakh-Soyuz,' the remitter's bank, against whose funds the blocking sanction was applied, does not meet any of the above-mentioned criteria either and may not be subject to the application of blocking.

Secondly, according to the statement made by Israel Discount Bank on March 16, 2000, the funds in the amount of USD $ 378,620.00, payable to Sotisco Trading Co., were placed on a direct deposit account opened in the name of our bank with a restriction on the free use of the Funds.

Considered the above, the right of ownership of the funds in question belong[ed] to Ingosstrakh-Soyuz from the moment they were placed on the deposit account (the funds did not transfer from the possession of our Bank into the possession of the beneficiary's bank). In view of this legal fact these funds may not be blocked because they are not owned by the Government of Sudan against whom the embargo is applied.

Ingosstrakh-Soyuz is under a jurisdiction [sic] of the Russian Federation which is not the target of the embargo. . .

Under the circumstances and for the purpose of maintaining sovereignties' parity and protecting [the] commercial interest of the United States and other states (including the Russian Federation) which are not subject to the sanctions similar to those imposed on Sudan, the funds of the business entities proceeding from the named countries (other than Sudan) cannot be remitted to Sudan but most be returned, without any limitation, to the business entities of [the] respective countries. This conclusion is based on the legal circumstance that the property interest of the United States as well as those of the

business entities of other states, except Sudan, regarding the use of the funds are not subject to restrictions to the same extent to which there are restrictions as to:

      (a)     the right of the United States to protect … state (including property) interests of the United States in respect to any countries and their business entities which are subject to nontariff measures…

      (b)     the property interests of U.S business entities on the territory of the Russian Federation and other states (except Sudan), which have not imposed (do not apply) a sanction (an embargo) against the United States.

According to the U.S. Code of Federation Regulations, the prohibition against the repatriation of … monetary funds concerns exclusively Sudan and its business s entitles, as well as the payments made in favor of Sudan.  The other way round [sic],, the Regulations do not contain any probation against the repatriation of … funds owned by subjects of the civil circulation of other states [sic].

This legal concept is reflected in the section "Blocked Assets of the Government of Sudan," Part 538 Title 31 according to which any funds transfers routed to business entities of Sudan may not be effected, whereas the funds are debited from the account of a business entity (and placed on a special account which is not the account of the remitter), *i.e.*, pass from the possession of the latter into the possession of the Government of Sudan or a business entity of Sudan.  Such funds transferred may be cancelled [sic] only if the embargo is lifted or upon a license from the OFAC.

In view of the above, it seems that our request sent to you earlier was considered by your office in the light of a possible cancellation of the funds transfer after the property right in the funds had been transferred from our bank to Sotsico Trading Co., a business entity of the Sudan.

However, in our case the funds were already transferred from our account to a different account opened in our own name: the beneficiary in this transaction is our bank, [and] not a business entity of the Government of Sudan.

We kindly ask you to consider the possibility of release and return the funds from our account in view of the absence of any legal restrictions imposed on the Russian Federation to repatriate the funds belonging to business entities of the Russian Federation from the territory of the United States.

(40)    On November 7, 2000, OFAC sent a letter to Plaintiff, ignoring all of the supplemental facts and arguments submitted by Plaintiff, and blindly repeating that "the funds in question represent a commercial payment to Islamic Development and Co-operative Bank, Khartoum, Sudan, for the benefit of Sotsico Trading Co., Sudan," and "[b]ecause the

COMPLAINT             16

aforementioned bank is owned and/or controlled by the Sudanese Government, the funds

represent an interest in property that is properly blocked under the Regulations.

(41)    On May 21, 2001, Plaintiff again sent a letter to OFAC, requesting

reconsideration, and summarizing the critical point:

> After the said funds had been blocked, Ingosstrakh, holding its business reputation and executing obligations to the insured company, effected payment settling the claim of Sotisco Trading Co. in Great Britain pounds via a European bank and Sotisco Trading Co. received the funds due in compliance with the terms of the insurance policy.
>
> The original currency of the payment was British pounds.  The payment was routed via a U.S. bank in error by Ingosstrakh Soyuz, therefore we had to acknowledge our mistake and accept the losses to maintain good relations with our principal shareholder, Ingosstrakh.
>
> *The funds being kept blocked belong to Ingosstrakh and the Sudanese Government cannot have an interest in them.*  [Emphasis added.]

(42)    On May 31, 2001, OFAC sent a letter to Plaintiff, again refusing reconsideration.

OFAC's refusal to release the block on Plaintiff's account constitutes a "final" agency action.

(43)    In summary, OFAC has refused to release a block on an account that belongs

exclusively to Plaintiff.  The account was frozen by the Israel Discount Bank of New York on

May 13, 2000 pursuant to the Sudanese Sanction Regulations.  However, because Plaintiff's

parent Ingosstrakh ultimately paid its obligation on the insurance policy covering the damaged

wheat flour, no Sudanese entity has any interest in those funds any more, even assuming that

such an interest originally existed.  The funds belong exclusively to Plaintiff.  Plaintiff and its

frozen New York bank account are outside and beyond any rational interest of OFAC in the

administration and enforcement of the Sudanese Sanction Regulations.

COUNT I

**Arbitrary and Capricious Agency Action**
**in Violation of the Administrative Procedure Act**

(44)    OFAC's denial of a license to release the block on Plaintiff's account at the Israel

Discount Bank of New York is an agency action subject to judicial review under the

Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and cannot be sustained if it was arbitrary

or capricious.

(45)    Under the Section 706(2)(A) of the Administrative Procedure Act , a court may –

and must - set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." At a minimum, that standard requires the agency to

examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made. The Court's review under the

APA is highly deferential, but agency action is arbitrary and capricious if it departs from agency

precedent without explanation.

(46)    In its administration of the Sudanese Sanction Regulations, OFAC has

characteristically released the block on accounts that were frozen by an intermediary bank

merely because of an inadvertence in the routing of payment. Its refusal to do so in the present

case was arbitrary and capricious within the meaning of the Administrative Procedure Act, 5

U.S.C. §706(2)(A).

(47)    Agencies such as OFAC are free to change course as their expertise and

experience may suggest or require, but when they do so they must provide a reasoned analysis

indicating that prior policies and standards are being deliberately changed, not casually ignored.

In response to Plaintiff's successively detailed explanations of the facts warranting a release of

its blocked account, OFAC replied with nothing but canned repetitions of a boilerplate statement

COMPLAINT                                18

and finally suggested that Plaintiff's ultimate payment of insurance proceeds covering a damaged cargo of wheat flour represented an attempt to circumvent the Sudanese Sanction Regulations by extinguishing the interest of the Government of Sudan, whereas in reality Plaintiff's action was nothing other than a mandatory payment pursuant to the terms of a standard international shipping insurance policy issued by Plaintiff, a non-U.S. entity, to non-U.S. insureds, covering a non-U.S. cargo consisting of wheat flour, an agricultural commodity for which a license could have validly been sought.

(48)     OFAC's failure in this case to account for conflicting precedent, which would allow for the release of a blocked account under these circumstances, constitutes an inexcusable departure from the essential requirement of reasoned decision making in violation of the Administrative Procedure Act, 5 U.S.C. § 704(a)(A).

(49)     Plaintiff acknowledges that, when Plaintiff inadvertently routed an insurance payment covering a cargo of damaged wheat flour through the Israel Discount Bank of New York, those funds were ultimately destined for Sotisco Trading Co., a Sudanese entity, and were properly blocked pursuant to OFAC regulations.  However, at the present time, no Sudanese entity has any interest in the funds any more, because the insurance payment owed by Plaintiff to the Sudanese purchaser of wheat flour was subsequently paid out by alternative channels not involving any U.S. bank.

(50)     Plaintiff and its colleagues in the international banking community cannot understand why OFAC would deny Plaintiff's application for a license to unblock its New York account in view of the fact that Plaintiff, who is not subject to any sanctions program, is the only entity that has any remaining interest in the account.

(51)     The closest thing to a rationale offered by OFAC for its denial of Plaintiff's

license application was made in the letter dated 14 June 2000, where OFAC stated:

> Once property is blocked because of a Sudanese Government interest, we do not
> recognize attempts to cancel the original payment instructions or attempts to make a
> second payment to the beneficiary as a means of extinguishing the Sudanese Government
> interest in the original blocked funds transfer.

(52)     By its statement quoted in the preceding paragraph, OFAC effectively holds that

the ultimate pay-out of insurance proceeds by Plaintiff's parent Ingosstrakh to Sotisco Trading

Co. was an "attempt[] to...extinguish[] the Sudanese Government interest in the original blocked

funds transfer[,]" when in fact the sole and exclusive aim of such payment was to discharge

Ingosstrakh's own contractual obligations under a standard international shipping insurance

policy, issued to non-Sudanese insureds. *OFAC has erroneously, without foundation or*

*justification, attributed an ulterior motive to the actions of Plaintiff and its parent Ingosstrakh*

*where none existed.*

(53)     OFAC's precedent of granting licenses to release the block on funds in cases

where funds were frozen only because they had been inadvertently routed was referenced in a

communication from President Bush dated May 3, 2001, 2001, stating in relevant part:

> Since the issuance of Executive Order 13067, The Department of the Treasury's
> Office of Foreign Assets Control ("OFAC") has made numerous decisions with respect to
> applications for authorizations to engage in transactions under the Sudanese sanctions.
> As of March 12, 2001, OFAC, during the course of this program, has issued a total of 506
> licenses as well as 132 authorizations to non-governmental organizations engaged in the
> delivery of humanitarian aid.  Sixty-four licenses were issued during the current reporting
> period. *The majority of these licenses permitted the unblocking of financial transactions*
> *for individual remitters who inadvertently routed their funds through blocked Sudanese*
> *banks.*  Twenty-two licenses were issued authorizing commercial sales and exportation to
> Sudan of *bulk agricultural commodities, food and agricultural products*, medicine and
> medial equipment.

Message from the President of the United States, "A 6-Month Report on the National Emergency

With Respect to Sudan That Was Declared in Executive Order 13067 of November 3, 1997,

Pursuant to 50 U.S.C. 1641(c)" (U.S. Gov't Printing Office 2001), *posted at*

http://www.treas.gov/offices/enforcement/ofac/ presdocs/sudansemi05301.pdf (emphasis

added).[1]

(54)     The Presidential Message quoted above pertains to payments which were

inadvertently routed through a Sudanese bank in which no Sudanese purchaser ever had any

interest.  In the present case, by contrast, the funds in question were ultimately destined for a

Sudanese purchaser.  However, that distinction is meaningless because in either case the funds

were blocked merely because of an inadvertence in routing.  Further, any distinction between the

present case and the instances referenced in the Presidential Message is meaningless because, in

the instances cited in the Presidential Message, the Sudanese intermediary banks would also have

had a financial interest in the transaction, even if they were not the "purchaser."

(55)     The Presidential Message establishes that there was a *valid basis* for the

application that Plaintiff submitted to OFAC seeking a release of the blocked account.

(56)     The Presidential Message also highlights an issue that was *overlooked* by OFAC

in denying Plaintiff's license application, namely, that that in addition to involving an application

for licensing authority to release a block on funds that were inadvertently routed, the underlying

transaction involved a shipment of an agricultural product – wheat – which constituted a separate

ground for seeking a license.

---

[1]     *See also* "Report on Developments Concerning the National Emergency With Respect to Sudan
That Was Declared in Executive Order 13067 of November 3, 1997, and Matters Relating to the Measures in That
Order, Pursuant to 50 U.S.C. 1641(c)" (U.S. Gov't Printing Office, Washington, D.C. 2000), *posted at*
www.treas.gov/offices.enforcement/ofac/presdocs/sudanesemi051700.pdf.  Subsequent presidential declarations
have continued the state of national emergency with Sudan but have offered no similar statistics.

(57)    While OFAC never cited a specific regulation in denying Plaintiff's application for a release of the block on its account, the circumstances of this case call for an interpretation of 31 C.F.R. § 583.403(a), which provides:

**§ 583.403    Termination and acquisition of an interest in blocked property.**

(a)    Whenever a transaction licensed *or authorized by* or pursuant to this part results in the transfer of property (including any property interest) away from the Government of Sudan, such property shall no longer be deemed to be property in which the Government of Sudan has or has had an interest unless there exists in the property another interest of the Government of Sudan, the transfer of which has not been effected pursuant to license or other authorization.

31 C.F.R. § 583.403(a)(emphasis added).

(58)    Pursuant to 31 C.F.R. § 583.403(a), *id.*, the question for determination is whether Plaintiff's ultimate pay-out of insurance proceeds to Sotisco Trading Co. constituted a transaction that was "authorized by" OFAC, *id.*, and, if so, whether that event resulted in the "transfer of property [*i.e.,* Sotisco's interest in the blocked account] away from the Government of Sudan..."

(59)    To hold that the ultimate pay-out of insurance proceeds by Plaintiff's parent Ingosstrakh to Sotisco Trading Co. was "unauthorized" by OFAC would contradict international law by extending OFAC's power of "authorization" to a non-U.S. contract among and between non-U.S. parties, entered and performed outside U.S. borders, involving the insurance of a non-U.S. cargo consisting of an agricultural commodity consigned to a non-U.S. purchaser in a non-U.S. destination.  As the ultimate pay-out of insurance proceeds by Ingosstrakh to Sotisco Trading Co. was outside OFAC's jurisdiction, it could not lawfully be prohibited by OFAC and cannot reasonably be construed to have been "unauthorized" within the meaning of 31 C.F.R. § 583.403(a).

(60)    In fact, there is no evidence in the record that Sotisco Trading Co., the Sudanese purchaser, was an entity of the Sudanese Government.  In its repeated communications to Plaintiff, OFAC boldfaced the name of the Islamic Development and Co-operative Bank, stating that the latter was controlled by the Sudanese Government.  However, the Islamic Development and Co-operative Bank was not the beneficiary of the transaction.  The beneficiary of the transaction was the consignee, Sotisco Trading, in its capacity as a purchaser of wheat flour – in this case, damaged wheat flour.

(61)    Even assuming that Sotisco Trading Co. was an entity of the Sudanese Government, and assuming further that the Sudanese Government had an interest in Plaintiff's blocked account prior to the ultimate pay-out of insurance proceeds by Plaintiff's parent Ingosstrakh to the Sudanese purchaser of the damaged wheat flour, it is undeniable that the ultimate pay-out operated to "transfer" that interest back to the Plaintiff within the meaning of the applicable regulation.  OFAC's refusal to release the blocked account is therefore in conflict with the applicable regulation, 31 C.F.R. § 583.403(a).

(62)    Policy considerations require this Court to grant substantial deference to OFAC in the administration and interpretation of its own regulations.  As such, the term "property" as it appears in the applicable regulation should be construed broadly in recognition of the agency's wide discretion.  However, there is no requirement for the Court to construe the circumstances to create a property interest on behalf of Sudan that would not otherwise be cognizable under governing legal principles. *Centrifugal Casting Machine Co., Inc. v. Republic of Iraq*, 966 F.2d 1348 (10th Cir. 1992).  Nor is OFAC at liberty to proclaim a property interest where there is none, *id.,* any more than it may properly ascribe a false motive to Plaintiff for its ultimate pay-out of insurance proceeds, as though such payment were prompted by an intention to circumvent

the Sudanese Sanction Regulations, rather than to honor its commitment as a reputable and reliable international insurance carrier under an ordinary insurance policy covering non-U.S. entities and a non-U.S. cargo consisting of wheat flour. Refusing to release the block on Plaintiff's account does nothing to punish Sudan or to deny Sudan the use of an asset in which it could claim a property interest. The only party punished by OFAC's action is the Plaintiff.

(63)    Since the Sudanese purchaser in the present case has no interest in the blocked account, the only rationale for continuing to block the account is to punish the Plaintiff for engaging in a transaction as though the purpose of the transaction had been to evade the force and effect of the Sudanese sanctions. However, no rational ground exists to conclude that such a motivation accounted for the Plaintiff's ultimate pay-out of the insurance proceeds. Instead, the only rational explanation for the Plaintiff's ultimate payment was the one articulated in the Plaintiff's request for reconsideration of OFAC's determination, namely, the need to preserve its reputation in the international commercial marketplace by honoring its contractual obligation under a standard insurance policy.

(64)    Since Plaintiff was not subject to OFAC's regulation, and its ultimate pay-out of insurance proceeds to Sotisco Trading Co. did not violate any OFAC regulation, OFAC's refusal to release the block on Plaintiff's account is arbitrary and capricious, an abuse of discretion, a violation of its own regulations, practices and procedures, and for those reasons, is subject to reversal under the Administrative Procedure Act, 5 U.S.C. § 706(2)(a).

WHEREFORE, Plaintiff prays for an Order:

(1)    Reversing OFAC's refusal to release Plaintiff's account at the Israel Discount Bank of New York;

(2)    Holding that OFAC's refusal to release Plaintiff's account at the Israel Discount

Bank of New York constituted arbitrary and capricious action, an abuse of discretion, a violation

of its own regulations, and for those reasons, a violation of the Administrative Procedure Act, 5

U.S.C. § 706(2)(a).

(3)    Awarding costs and attorney fees to Plaintiff pursuant to 5 U.S.C. § 504.

Respectfully submitted,

**Joint Stock Commercial Bank "SOYUZ"**

by:    _Bruce A. McDonald_

Bruce A. McDonald, D.C. Bar No. 293753
**SCHNADER HARRISON SEGAL & LEWIS LLP**
2001 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
(202) 419-4200

Dated:    May 27, 2005

COMPLAINT    25